UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X
JANNIL CHRISTON-SCORPIO SHEPPARD,

        *Plaintiff*,

-against-

                                  **MEMORANDUM AND ORDER**

                                  21-CV-2075(KAM)(TAM)

LT. LEUZE; P.O. SOSE; P.O. GLORIMAR
DURAN,

        *Defendants*.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

Plaintiff Jannil Christon-Scorpio Sheppard commenced this action on March 26, 2021, against four New York City police officers based on his removal from 392 Adelphi Street, which he alleged was in violation of 42 U.S.C. §§ 1981 and 1983. (ECF No. 2 ("Compl.") at 2.) Defendants previously moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* ECF No. 29, Motion to Dismiss.) On June 27, 2022, the Court granted the Defendants' motion as to the Fourteenth Amendment and Section 1981 claims and denied it as to the Fourth Amendment claim. (*See* ECF No. 33, M&O.) Defendants now move for summary judgment as to Plaintiff's sole remaining cause of action alleging that Plaintiff's removal from the 392 Adelphi Street premises was an illegal seizure that violated the Fourth Amendment.

For the reasons set forth below, the Court finds no genuine disputes of material fact and **grants** Defendants' motion for summary judgment with respect to Plaintiff's remaining claim which is **dismissed** with prejudice.

<u>BACKGROUND</u>

## I.   Factual Background

The following facts are taken from the parties' Local Rule 56.1 statement and counter-statement, as well as from documents and transcripts cited in the parties' Local Rule 56.1 statements. (*See* ECF No. 65, Defendants' Statement of Undisputed Material Facts ("Def. 56.1"); (ECF No. 68, Plaintiff's Counter-Statement ("Pl. 56.1").)  Except as otherwise indicated, the facts set forth below from the parties' Local Rule 56.1 statements are undisputed.  The court summarizes only those facts that are relevant and material to the adjudication of the instant motion.

At the heart of the remaining claim in this case is a property in Brooklyn – 392 Adelphi Street.  Plaintiff stated during his deposition that the property has been in his family "for generations" and that his grandmother, Josephine English, had previously resided in an apartment at the property.  (ECF No. 72, Deposition of Jannil Sheppard ("Pl. Dep."), at 22, 64.)  Indeed, property records available on New York City's Automated City

Register Information System[1] ("ACRIS") support this contention, reflecting that the property was transferred from 375 Stuyvesant Ave Realty Corporation[2] to Josephine English in 1993. *See* ACRIS, N.Y.C. Dep't of Fin., https://a836-acris.nyc.gov/DS/DocumentSearch/Index (last visited Jul. 25, 2024). Plaintiff stated that his grandmother began living at the property after the death of his grandfather, and that Plaintiff's father, Michael Sheppard, resided with Plaintiff's grandmother at the property. (Pl. Dep. at 64-65; Compl. at p. 31.) Plaintiff's father continued to reside in the apartment at 392 Adelphi Street following the death of Plaintiff's grandmother in 2011. (Pl. Dep. at 65.)

It is undisputed that 392 Adelphi Street was conveyed to Barry Sheppard[3], Plaintiff's uncle ("Uncle Barry"), in or around 1999 by Plaintiff's grandmother Josephine English. (Def. 56.1 ¶ 16.) Property records on ACRIS also reflect this transaction, showing

---

[1] "Multiple district courts within the Second Circuit have held that property records made available on ACRIS are subject to judicial notice." *Disame v. Kantharia*, No. 23-CV-7102 (HG)(PK), 2023 WL 6879614, at *2 n. 2 (E.D.N.Y. Oct. 18, 2023); *see also Fawn Second Ave. LLC v. First Am. Title Ins. Co.*, 610 F. Supp. 3d 621, 628, 633 (S.D.N.Y. 2022) (taking judicial notice of ACRIS records because "New York County's real property records" were "undoubtedly proper subjects of judicial notice" and dismissing complaint).

[2] Plaintiff stated in his deposition that this corporation was controlled by his family, although it was dissolved and then later re-incorporated by a family member. (Pl. Dep. at 23.) The 1993 Deed transferring the property states that at the time of the conveyance, Josephine English was the President of 375 Stuyvesant Ave Realty Corporation. *See* ACRIS, N.Y.C. Dep't of Fin., https://a836-acris.nyc.gov/DS/DocumentSearch/Index (last visited Jul. 25, 2024).

[3] Barry Shepard is also known as "Ira Barry Sheppard," based on civil court documents attached to Plaintiff's complaint. (*See* Compl. at p. 21.)

3

that Josephine English conveyed 392 Adelphi Street to Uncle Barry via deed on December 20, 1999.  *See* ACRIS, N.Y.C. Dep't of Fin., https://a836-acris.nyc.gov/DS/DocumentSearch/Index (last visited Jul. 25, 2024).  Subsequently, on July 18, 2017, Plaintiff's Uncle Barry transferred 392 Adelphi Street to "392 ADL LLC," signing the transfer documents as both the seller and as a "member" or "managing member" of the buyer, 392 ADL LLC.  (ECF No. 66-9, Exhibit I to the Declaration of Caroline McGuire ("Ex. I"), at 6-9.)  Plaintiff acknowledged during his deposition that it was possible that Uncle Barry owned 392 ADL LLC, and stated that even if Uncle Barry did not own the entity, "he's in full control of it."  (Pl. Dep. at 121.)  No evidence has been submitted showing any change in the membership of 392 ADL LLC or any subsequent transfer of 392 Adelphi Street, and ACRIS records do not reflect any further transfers after 2017.

Plaintiff began to stay with his father at 392 Adelphi Street when Plaintiff moved to the neighborhood from East New York in 2012.  (*Id.* at 142.)  Plaintiff acknowledged in his deposition that his residence at 392 Adelphi Street was somewhat intermittent from 2012 to 2020, as he also lived in shelters.  (*Id.* at 112-13.)  Plaintiff stated that from 2016 forward, he stayed at a shelter instead of 392 Adelphi Street "two or three nights a week."  (*Id.* at 113.)  During the time that Plaintiff stayed with his father at 392 Adelphi Street, he never paid any rent.  (*Id.* at 114.)

4

Plaintiff also acknowledged that his father had a restraining order against him at some point during the period he intermittently stayed at 392 Adelphi Street, possibly in 2018.  (*Id.* at 49.) Records submitted by the Plaintiff show that the order of protection barring him from his father's residence was issued on November 11, 2018, and expired on May 31, 2019.  (ECF No. 69, Exhibit 1 to the Cajoux Declaration.)

Plaintiff further explained in his deposition that he had a storage unit for his belongings because his father was "throwing [him] out [of 392 Adelphi Street] a hundred times a year or twice every day . . . [his father was] very argumentative, and [] had a severe alcohol problem . . . [and his father was] throwing everybody out all the time."  (*Id.* at 143.)  Plaintiff explained that "at any moment" his father could "get mad and throw [him] out" of 392 Adelphi Street, necessitating the storage unit.  (*Id.* at 141.)  For the same reason, Plaintiff also received mail at a mailing facility at 40 Ann Street, New York, to avoid any disruption in receiving mail if his father were to put him out of 392 Adelphi Street.  (*Id.* at 174-76.)

The events leading to Plaintiff's lawsuit began on March 7, 2020, when Plaintiff voluntarily admitted himself to an alcohol treatment center, where he stayed throughout the duration of the program.  (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)  On March 21, 2020, the treatment program ended, and Plaintiff returned to his father's

5

apartment at 392 Adelphi Street. (Def. 56.1 ¶¶ 6, 8.) Upon arriving at 392 Adelphi Street, Plaintiff was told by his Uncle Barry that the apartment needed to be quarantined because his father had contracted COVID-19, so Plaintiff picked up some of his belongings that were stored in the apartment before departing. (*Id.* ¶ 9; Pl. Dep. at 97-98.) After departing 392 Adelphi Street, Plaintiff made plans to stay with his Uncle John Sheppard ("Uncle Johnny") at 1325 Union Street in Crown Heights, Brooklyn. (Def. 56.1 ¶ 7.) In addition to Uncle Johnny's apartment, Plaintiff also temporarily stayed in shelters, on trains, and outdoors between March 21, 2020, and April 19, 2020. (Def. 56.1 ¶¶ 12-13.)

On April 14, 2020, Plaintiff's father passed away. (Def. 56.1 ¶ 15.) Plaintiff believed that once his father had passed away, he had gained a possessory interest in 392 Adelphi Street. (Def. 56.1 ¶ 17.) On April 19, 2020, Plaintiff returned to 392 Adelphi Street. (Def. 56.1 ¶ 18.) Upon his arrival, Plaintiff discovered that "many items [had been] cleared away and put into garbage bags." (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.) Plaintiff anticipated that his Uncle Barry was going to state that Plaintiff could no longer stay at 392 Adelphi Street, and waited for his Uncle Barry to arrive. (Def. 56.1 ¶ 20; Pl. Dep. at 126.) When Uncle Barry arrived, he told Plaintiff that he "[c]an't stay here [at 392 Adelphi Street.]" (Pl. Dep. at 126.) Plaintiff and his Uncle Barry argued about Plaintiff's right to be at the property,

6

and eventually, Uncle Barry "half tried to swing" a walking stick at Plaintiff. (*Id.* at 127.)  After Uncle Barry swung the walking stick, Plaintiff shut the door in Uncle Barry's face and called the police. (Def. 56.1 ¶ 25; Pl. Dep. at 128.)

The police responded to a radio call for what was described as a "verbal dispute" incident in which one of the individuals involved had a stick. (Def. 56.1 ¶¶ 27-28.)  Several police officers arrived to 392 Adelphi Street, and Officer John Sosa[4] ("Officer Sosa") approached Plaintiff to speak with him. (ECF No. 66-5, Officer Sosa's Deposition, Exhibit E to the McGuire Declaration ("Ex. E"), at 11-12.)  Plaintiff explained to Officer Sosa that his father had passed away, and that upon his father's death, he inherited the property. (Def. 56.1 ¶ 29; Ex. E. at 16.)  Plaintiff informed Officer Sosa that his family owned properties in the surrounding area, including 392 Adelphi Street. (Def. 56.1 ¶ 30.)  Plaintiff explained that his uncle and his father owned these properties as it was listed on his grandmother's will. (*Id.* ¶ 31.)  Plaintiff acknowledged to Officer Sosa, however, that the registered owner of 392 Adelphi Street "might be [Uncle Barry]." (Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33; Officer Sosa's Body Worn Camera Footage, Exhibit F to the McGuire Declaration ("Ex. F"), at 3:02-3:21[5].)

---

[4] Incorrectly named in the caption as Officer "Sose."
[5] The body worn camera footage cited herein includes the timestamp in the underlying video file.

While Officer Sosa was speaking to Plaintiff, other police officers spoke to Uncle Barry.  (Def. 56.1 ¶ 34; Ex. E at 16.) Uncle Barry told Officers Rodriguez and Kim (and later Officer Sosa) that he owned the building at 392 Adelphi Street "entirely." (Def. 56.1 ¶ 38.)  Uncle Barry told Officers Rodriguez and Kim that Plaintiff did not live at 392 Adelphi Street, and that Plaintiff could not stay there.  (*Id.* ¶ 35.)  Uncle Barry also explained to the officers that Plaintiff had a mental health history, was homeless, and that he did not know where Plaintiff lived.  (*Id.* ¶¶ 35-37.)

Uncle Barry explained to Officer Sosa that he had come to the property because a tenant called Uncle Barry to inform him that someone the tenant had never seen before was on the first floor of the property.  (*Id.* ¶ 56.)  When Officer Rodriguez spoke to tenants at 392 Adelphi Street, the tenants identified Uncle Barry as their landlord and stated that Plaintiff did not live at the location. (*Id.* ¶ 44[6]-45.)

While Plaintiff was speaking to Officer Sosa, he explained that the portion of 392 Adelphi Street he considered his bedroom lacked heat and had visible mold in it.  (*Id.* ¶ 39.)  Plaintiff

---

[6] Plaintiff argues that Officer Sosa and Lieutenant Leuze never spoke to tenants or witnesses, but the Rule 56.1 Statement states only that Officer *Rodriguez* spoke to tenants, which is reflected in Officer Rodriguez's body worn camera footage.  (Exhibit G to the McGuire Declaration ("Ex. G"), at 5:07–5:23.)

also explained to Officer Sosa that all[7] of his personal belongings were in storage because his father would frequently throw him out of 392 Adelphi Street.  (*Id.* ¶¶ 40, 42.)  Plaintiff also explained that the set of keys he had for 392 Adelphi Street had been given to him by his Uncle Johnny.  (*Id.* ¶ 46.)  Officer Sosa later testified at his deposition that the fact that Plaintiff had to borrow keys to the property led him to believe that Plaintiff did not live at 392 Adelphi Street.  (Ex. E at 36-37.)

Eventually, officers entered 392 Adelphi Street to further investigate whether Plaintiff lived there.  (Def. 56.1 ¶ 50; Ex. E at 24.)  The officers observed Plaintiff did not have a bed and that there was no heat.  (Def. 56.1 ¶¶ 51-52.)  Officer Sosa later testified in his deposition that Plaintiff did not have any property in the residence, and that the residence was not clean and was in disorder.  (Ex. E at 25.)  Soon after, the officers called their supervisor, then-Lieutenant (now Captain) Stephen Leuze, to the scene.  (Def. 56.1 ¶ 54; Captain Leuze's Deposition, Exhibit D to the McGuire Declaration ("Ex. D"), at 10-15.)

When Lieutenant Leuze arrived at 392 Adelphi Street, the officers advised him of the situation.  (Def. 56.1 ¶ 55.) Lieutenant Leuze entered the residence, and afterwards, spoke to

---

[7] Plaintiff disputes that all of his belongings were *actually* in storage, but it is undisputed that the body worn camera footages shows Plaintiff telling Officer Sosa that "[a]ll my stuff is in my storage . . . in Manhattan." (*See* Ex. F, at 5:23-5:50.)

Plaintiff and Uncle Barry separately outside. (*Id.* ¶¶ 57-61.)
Uncle Barry informed Lieutenant Leuze that he allowed Plaintiff's
father to stay at 392 Adelphi Street, that the Plaintiff was living
in a shelter, and that the family "kind of disowned [Plaintiff],
so to speak, in some shape or form," and that Plaintiff believed
he now owned the property because his father passed away. (*Id.* ¶
62.) Uncle Barry additionally informed Lieutenant Leuze that
Plaintiff's father previously had an order of protection against
Plaintiff that had since expired. (Def. 56.1 ¶ 63; Ex. D at 35-
36.)

Lieutenant Leuze asked Plaintiff to step outside to speak and
Plaintiff exited 392 Adelphi Street with a small bag. (Def. 56.1
¶ 65.) Plaintiff explained to Lieutenant Leuze that the last time
he was at the location was "approximately two weeks ago" and he
currently did not have a bed in the location. (*Id.* ¶¶ 66-67.)
Plaintiff told Lieutenant Leuze that because his New York driver's
license listed 392 Adelphi Street as the address, and because he
received mail at the location, the officers should not ask him to
leave. (*Id.* ¶ 68.) Plaintiff also asked the officers why they
did not ask Uncle Barry for any documentation demonstrating his
ownership of the building. (*Id.* ¶ 69.) Lieutenant Leuze and
Officer Rodriguez explained to Plaintiff that witnesses did not
recognize Plaintiff as a tenant, and they also identified Uncle
Barry as their landlord who received their monthly rent. (*Id.* ¶

70.)  Officer Sosa encouraged Plaintiff to resolve the dispute in landlord tenant court because police officers do not determine ownership; they just "validate who lives there or not."  (*Id.* ¶ 71.)  Throughout this interaction, Plaintiff continued to protest that he was a part owner of the house.  (*Id.* ¶ 72.)

Ultimately, Lieutenant Leuze determined, based on the officers' investigation of the situation, that Plaintiff was not a resident of 392 Adelphi Street, and that Uncle Barry owned the property.  (Ex. D at 31-34, 46-47.)  Lieutenant Leuze therefore ultimately approved the decision to ask Plaintiff to leave the property, and subsequently asked Plaintiff to leave 392 Adelphi Street.  (Def. 56.1 ¶¶ 78-79.)  Upon being asked to leave, Plaintiff left the immediate area of 392 Adelphi Street and went around the corner for approximately fifteen to twenty minutes.  (*Id.* ¶ 80.)  While he was around the corner, Plaintiff looked up the ownership of 392 Adelphi Street.  (*Id.* ¶¶ 81-82; Pl. Dep. at 162-64.)  Plaintiff believed that the deed proved that his uncle did not own the property and called the police as soon as he saw the ownership did not say "Barry Sheppard."  (Def. 56.1 ¶ 83.)

After Plaintiff called the police for a second time, a different group of officers responded to the call and arrived at 392 Adelphi Street.  (*Id.* ¶¶ 83-84.)  When those officers arrived, they began speaking with Plaintiff.  (*Id.* ¶ 85.)  Plaintiff made similar arguments to the second set of officers regarding his

father's death and his right to the property as he had made with the first group of officers. (*Id.* ¶¶ 86-89.) Plaintiff then showed the officers his driver's license and explained he had been living at 392 Adelphi Street since 2012. (*Id.* ¶ 90.) Plaintiff also described his previous altercation with Uncle Barry and his interaction with the first group of police officers. (*Id.* ¶¶ 92-93.) Plaintiff showed the officers that he had keys to 392 Adelphi Street and explained that his Uncle Johnny had given him the keys. (*Id.* ¶¶ 95-96.) Plaintiff admitted to the officers that he did not have any mail with his name on it at 392 Adelphi Street "right now."[8] (Def. 56.1 ¶ 98; Officer Carlin's Body Worn Camera Footage, Exhibit to the McGuire Declaration ("Ex. H"), at 3:28-3:47.)

Eventually, Officer Carlin spoke to Uncle Barry. (*Id.* ¶¶ 99-101.) Uncle Barry told Officer Carlin that he owned the building and had previously allowed Plaintiff's father to stay at the apartment until his recent death. (*Id.* ¶¶ 102-03.) Uncle Barry then stated that he hadn't seen Plaintiff in over a year and had told Plaintiff that he could not stay at the apartment. (*Id.* ¶¶ 104; 106.) Uncle Barry further told Officer Carlin that Plaintiff had previously "beat his father up," and that Plaintiff's father had two orders of protection against him which meant Plaintiff

---

[8] Plaintiff disputes this paragraph of Defendants' Rule 56.1 statement, but the Court's review of Officer Carlin's body worn camera footage confirms that Plaintiff states to the police officers "I don't have any mail there [at the apartment] right now." (Ex. H. at 3:28-3:47.)

should not have been anywhere near 392 Adelphi Street. (*Id.* ¶ 108.) Uncle Barry stated to Officer Carlin that Plaintiff did not live with his father. (*Id.* ¶ 109.)

While speaking to Officer Carlin, Uncle Barry called his nephew, Lieutenant Tarik Sheppard, who was a police officer in the NYPD, and put the call on speaker phone for Officer Carlin. (*Id.* ¶ 111.) Lieutenant Sheppard explained to Officer Carlin that Plaintiff's father had passed away, and that Plaintiff had not been living at 392 Adelphi Street on a regular basis, arriving only within the last day. (*Id.* ¶¶ 112-13.) Another police officer at the scene, Officer Duran, witnessed some of this conversation take place. (*Id.* ¶¶ 117; 124.) Lieutenant Sheppard ended the call by providing his NYPD Tax Register Number, upon request, to Officer Carlin. (*Id.* ¶ 123.)

Uncle Barry indicated to the officers that he was going to change the locks at the location. (*Id.* ¶ 125.) Officer Duran then told Officer Carlin that she had spoken to Officer Rodriguez, who was one of the officers who had responded to the location earlier in the day. (*Id.* ¶ 126.) Officer Duran explained that she had been told that Plaintiff had not been living at 392 Adelphi Street for years and that Plaintiff was emotionally disturbed. (*Id.* ¶ 127.) Following this conversation, Officer Duran walked with Officer Carlin to speak to Plaintiff. (*Id.* ¶ 128.) Officer Carlin informed Plaintiff that he had spoken to members of

Plaintiff's family, who stated that Plaintiff did not live at the location.  (*Id.* ¶ 129.)  Officer Carlin explained to Plaintiff that "until the will is completely done and through and you take ownership, you don't own [392 Adelphi Street]."  (*Id.* ¶ 131.)  Officer Duran added, "You have to follow the correct procedures, your father just passed away, you can't just take ownership of a property that was your father's . . . You have an option of taking your things and leaving, or we could just send you to a hospital."  (*Id.* ¶¶ 134-135.)  Based on his investigation, Officer Carlin concluded Plaintiff did not live at the location.  (*Id.* ¶ 132.)

Plaintiff left the location shortly thereafter and was never put under arrest.  (*Id.* ¶¶ 136-38.)  The next day, on April 20, 2020, Plaintiff discovered that the locks at 392 Adelphi had been changed, and Plaintiff later stated in his deposition that he "assumed" his Uncle Barry changed the locks.  (*Id.* ¶ 145.)  When the officers twice responded to 392 Adelphi Street on April 19, 2020, Plaintiff was not proceeding in probate court against his Uncle Barry.  (*Id.* ¶ 139.)

## II.  Procedural History

Plaintiff commenced this action by filing a complaint against Defendants on March 26, 2021, (*see* Compl.), in the United States District Court for the Southern District of New York, which subsequently transferred the case to this court on April 9, 2021, (ECF No. 4, Transfer Order).  Plaintiff brought claims pursuant to

14

42 U.S.C. §§ 1981 and 1983, asserting that his Fourth and Fourteenth Amendment rights were violated. (Compl. At 2.)

On November 22, 2021, Defendants filed their fully-briefed motion to dismiss Plaintiff's complaint for failure to state a claim. (ECF Nos. 27-32.) On June 27, 2022, the Court granted in part and denied in part Defendants' Motion to Dismiss, dismissing Plaintiff's equal protection and 42 U.S.C. § 1981 claims, but allowing his Fourth Amendment claim to proceed. (ECF No. 33, M&O.)

The parties proceeded to discovery under the supervision of Magistrate Judge Taryn A. Merkl. (*See*, *e.g.*, August 17, 2022, Order; September 29, 2022, Minute Entry; November 10, 2022, Minute Entry; ECF No. 44; January 19, 2023, Minute Entry; March 1, 2023, Minute Entry; April 19, 2023, Minute Entry; May 15, 2023, Minute Entry.) During the course of discovery, Plaintiff obtained counsel, who entered a notice of appearance on April 27, 2023, and has represented Plaintiff since that time. (ECF No. 52.) A status report was given to the Court on June 30, 2023, certifying the close of fact discovery. (ECF No. 53.)

On July 31, 2023, Defendants submitted a motion for a pre-motion conference in anticipation of filing a motion for summary judgment. (ECF No. 54.) The Court held the conference on November 2, 2023, and set a briefing schedule. (November 2, 2023, Minute Entry.) The motion was fully briefed and submitted on February 12, 2024. (*See* ECF No. 63, Defendants' Notice of Motion for

15

Summary Judgment; ECF No. 64, Defendants' Memorandum of Law in Support ("Def. Mem."); Def. 56.1; ECF No. 66, Declaration of Caroline McGuire ("McGuire Decl."); ECF No. 67, Plaintiff's Memorandum of Law in Opposition ("Pl. Mem."); Pl. 56.1; ECF No. 69, Declaration of Marjory Cajoux ("Cajoux Decl."); ECF No. 70, Defendants' Reply in Further Support ("Def. Reply").)

## **LEGAL STANDARD**

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. For a genuine issue of material fact to exist, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

In reviewing a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d. Cir. 1996)); *accord Tolan v. Cotton*, 572 U.S. 650, 651 (2014) ("[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (alteration in original) (quoting *Anderson*, 477 U.S. at 255)).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita*

17

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

In opposing summary judgment, it is "not sufficient merely to assert a conclusion without supplying supporting arguments or facts," and a party must instead set forth "concrete particulars." *BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (citation omitted). Accordingly, "[t]he nonmoving party must go beyond the pleadings, and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Davis v. New York*, 316 F.3d 93, 100 (2d. Cir. 2002) (internal punctuation and citation omitted); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## DISCUSSION

Defendants seek summary judgment as to Plaintiff's sole remaining claim pursuant to 42 U.S.C. § 1983 relating to Defendants' alleged unlawful seizure of Plaintiff within the meaning of the Fourth Amendment. (See Def. Mem. at 1.)

For the reasons set forth below, the Court concludes that defendants are entitled to summary judgment dismissing Plaintiff's unlawful seizure claim both because (1) the undisputed facts show that Plaintiff did not have an expectation of privacy at 392 Adelphi Street nor the right to be there, and (2) Defendants Lieutenant Leuze, Officer Sosa, and Officer Duran are entitled to

18

qualified immunity with respect to their instruction for Plaintiff
to leave the property.

## I.   **Plaintiff's Unlawful Seizure Claim**

Plaintiff alleges an unlawful seizure claim based on the
Defendants' directive to Plaintiff to leave 392 Adelphi Street on
April 19, 2020.  (Pl. Mem. At 4-5.)  Defendants move for summary
judgment on Plaintiff's unlawful seizure claim, arguing that
Plaintiff lacks standing to bring a Fourth Amendment claim because
his Uncle Barry owns 392 Adelphi Street, because Plaintiff was not
actually residing at the premises and was not legally entitled to
remain there, and because Officer Duran told Plaintiff to leave a
public space.  (Def. Mem. at 9-21.)

To state a claim under Section 1983, "a plaintiff must allege
two elements: (1) the violation of a right secured by the
Constitution and laws of the United States, and (2) the alleged
deprivation was committed by a person acting under color of state
law."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-
88 (2d Cir. 2015) (internal quotation marks and citation omitted).
Here, Plaintiff's Section 1983 claim is based on alleged violations
of the Fourth Amendment by police officers.  (Compl. at 2.)  The
Fourth Amendment assures "the right of the people to be secure in
their persons, houses, papers, and effects, against unreasonable
searches and seizures."  *U.S. Const. amend. IV.*

The Fourth Amendment protects individuals' right to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy. *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006) (citation omitted).  The Fourth Amendment "does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" *Cassidy v. Chertoff*, 471 F.3d 67, 76 (2d Cir. 2006) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995)). Therefore, "a [plaintiff] must demonstrate (1) that he had an expectation of privacy that society is prepared to consider reasonable and (2) that he acted in a way with respect to the property in question that indicated a subjective expectation of privacy." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 181-82 (2d Cir. 2004).

Although common-law property concepts "do not control the Fourth Amendment inquiry," *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997), the Second Circuit has stated that "[a] mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully," *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980).  "Courts in this Circuit therefore frequently reject Fourth Amendment . . . claims by trespassers or squatters." *Murphy v. County of Chemung*, No. 18-CV-6628 (FPG), 2024 WL 3228056, at *13 (W.D.N.Y. June 28, 2024) (collecting cases).

It is undisputed that Plaintiff is not the owner of record of 392 Adelphi Street and did not have permission of the owner to be present there.  Instead, property records show that Plaintiff's Uncle Barry became the record owner of the property in 1999, and that he subsequently transferred the property in 2017 to "392 ADL LLC," signing the transfer documents as both the seller and as a "member" or "managing member" of the buyer, 392 ADL LLC.  (Ex. I at 6-9.)  Plaintiff makes no claim to have ownership or control over 392 ADL LLC, the current registered owner.  Instead, Plaintiff argues that he was a "lawful occupant" of 392 Adelphi Street, and thus entitled to a legitimate expectation of privacy at the property.  (Pl. Mem. at 9-11.)  There is no evidence that any individual affiliated with 392 ADL LLC[9], the property's owner of record, gave Plaintiff permission to be present at 392 Adelphi Street.  Based on the undisputed factual record, the Court does not find Plaintiff's argument to be persuasive.

Plaintiff is correct that that the Supreme Court has recognized that "overnight guests" can invoke the Fourth Amendment's protections. *Minnesota v. Olson*, 495 U.S. 91, 96-97,

---

[9] The Court notes that Uncle Barry was the "managing member" of 392 ADL LLC at the time he conveyed the property to the entity in 2017, but neither party offers any evidence regarding whether 392 ADL LLC's ownership, members, or management changed between 2017 and April 19, 2020.  (Ex. I at 6-9.) Notwithstanding this lack of evidence, what *is* clear is that Plaintiff does not claim to have been at the property with the permission of 392 ADL LLC or offer any evidence suggesting he had such permission.  (*See* Pl. Dep. at 121 ("[Question]: So do you think it's possible that your uncle Barry could own 392 ADL LLC? [Answer]: Absolutely. If not, he's in full control of it.").)

(1990).   In *Olson*, the court held that Olson's arrest violated his Fourth Amendment rights because an overnight guest like himself "seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.* at 99.   Furthermore, "[a] person need not 'reside' in a particular dwelling, in the sense of living primarily at that location, to enjoy a legitimate expectation of privacy when he is on the premises . . . a social guest can, under some circumstances, legitimately expect privacy in his host's home."   *Figueroa v. Mazza*, 825 F.3d 89, 109–10 (2d Cir. 2016).

"This 'overnight guest' theory of Fourth Amendment standing generally requires a showing [that the individua] actually enjoyed the owner or host's permission to be there."   *United States v. Harrison*, 683 F. Supp. 3d 184, 198 (N.D.N.Y. 2023) (citing *United States v. Ray*, 541 F. Supp. 3d 355, 380 (S.D.N.Y. 2021)).   "A Fourth Amendment seizure does not occur where a person is merely escorted out of a place in which he has no expectation of privacy." *Faga v. Faga*, No. 08-CV-11229 (CS), 2010 WL 11712776, at *6 (S.D.N.Y. Mar. 25, 2010).

As discussed in more detail in the factual background section, *supra*, Plaintiff resided intermittently at 392 Adelphi Street between 2012 and his admission to an alcohol treatment program on March 7, 2020.   (Def. 56.1 ¶ 4; Pl. Dep. at 112-13, 142.)   Plaintiff

stayed with his father at the property, but never paid any rent and was thrown out regularly by his father, who had permission from Uncle Barry to reside at the property. (Pl. Dep at 114, 141-43; Def. 56.1 ¶ 62.)  It is undisputed that Plaintiff stayed at 392 Adelphi Street because he was given permission by his father to stay at the property, and when his father revoked that permission or otherwise told him to leave, he departed. (Pl. Dep at 141-43.)  It is also undisputed that Plaintiff had not slept at 392 Adelphi Street since at least March 7, 2020, instead sleeping at another uncle's house, in shelters, on trains, and outdoors, and that his father passed away on April 14, 2020. (Def. 56.1 ¶¶ 4, 12-13, 15.)  Plaintiff could not have been at the property with his father's permission or at his father's invitation on April 19, 2020, as his father had passed away.

Furthermore, Plaintiff's argument that he was a "lawful occupant" of the property even after the death of his father, citing to *York v. W. Kingsbridge, LLC*, 133 N.Y.S.3d 783 (N.Y. Civ. Ct. 2020), is unavailing.  In *York*, the occupant of a rent-stabilized apartment resided in the property with her mother, the tenant of record, and paid the rent on behalf of her mother.  *Id.* After the death of the occupant's mother, the occupant reached out to the landlord to "try to clear up any rental arrears" before departing the apartment "for a couple of days."  *Id.*  Upon her return, the occupant discovered that the apartment's locks had

been changed.  *Id.*  The New York City Civil Court found that the changing of locks was an unlawful eviction because the occupant had "sustained her burden of proving that she had been in lawful possession of the subject apartment for more than thirty days at the time [the landlord] locked her out of the apartment."  *Id.*; *see also* N.Y. Real Prop. Acts. Law ("RPAPL") § 768(1)(a) ("It shall be unlawful for any person to evict . . . an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer.").

The facts of the instant case are easily distinguishable from *York*.  Plaintiff did not pay any rent to the owner of 392 Adelphi Street, and he had been absent from the property for at least 43 days as of April 19, 2020.  (Def. 56.1 ¶¶ 4, 15; Pl. Dep at 114, 141-43.)  Furthermore, Plaintiff's own complaint reflects that he subsequently initiated an illegal lockout proceeding against his Uncle Barry with the Housing Part of the Civil Court of the City of New York.  (Compl. at pp. 21-23); *see* RPAPL § 713(10).  The Housing Court found that title to 392 Adelphi Street passed from Plaintiff's grandmother to his Uncle Barry, and then to 392 ADL LLC.  (Compl. at p. 22.)  As such, the Housing Court concluded that even if Plaintiff was unlawfully ousted, he was not entitled to be restored to possession because he would not be able to prevail in a subsequent eviction proceeding.  (*Id.* at p. 23.)  Plaintiff's additional contention that he was in "constructive

24

possession" of the apartment at the time of his ejection is also unpersuasive, as Plaintiff has offered no evidence of any leasehold or possessory interest in 392 Adelphi Street. *See Hui Zhen Wei v. 259 E. Broadway Assocs. LLC*, 66 N.Y.S.3d 653 (N.Y. App. Term. 2017) (finding the Petitioner was at least in constructive possession of the apartment at the time when landlord locked her out based on Petitioner's husband's agreement to surrender the apartment). As a result, the Court does not find any evidence to suggest that Plaintiff was a "lawful occupant" of 392 Adelphi Street at the time he was asked to leave.

Because at the time that Plaintiff was asked to leave 392 Adelphi Street he was neither an owner nor a guest at the property, his Fourth Amendment rights were not implicated by his removal. *See Faga v. Faga*, 2010 WL 11712776, at *5. Plaintiff therefore did not have a legitimate expectation of privacy at the premises and in any event cannot prove that he was seized in being directed to leave the premises in violation of the Fourth Amendment. Defendants are entitled to summary judgment dismissing Plaintiff's claim of a violation of his Fourth Amendment constitutional rights.

Plaintiff's subsequent interaction with police officers on the sidewalk half a block away from 392 Adelphi Street similarly does not constitute a seizure and cannot support a claim of a violation of Plaintiff's constitutional rights. At the time Officer Duran, part of the second round of police officers to

respond, asked Plaintiff to leave the area, he was in a public space. (Def. 56.1 ¶¶ 128-35.) Plaintiff failed to address Defendants' arguments on this point and appears to concede that no seizure occurs when an individual is asked to leave a place in which he has no expectation of privacy. (Pl. Mem. at 13.) The Court finds that Plaintiff was not seized when he was asked by police officers to leave the area immediately surrounding 392 Adelphi Street, as it was a public space in which he had no expectation of privacy. *See Sethi v. Nassau County*, No. 11-CV-6380 (SJF)(GRB), 2014 WL 2526620, at *5 (E.D.N.Y. June 3, 2014) (finding plaintiff was not restrained when law enforcement encouraged plaintiff to leave a public space called RXR Plaza); *Posr v. Killackey*, No. 01-CV-2320 (LTS)(GWG), 2003 WL 22962191, at *7 (S.D.N.Y. Dec. 17, 2003) (finding no seizure when videographer was escorted out of courthouse, released, and "not prevented from going anywhere he wanted – except back into the courthouse"). Thus, Officer Duran's statement and acts do not constitute a seizure, and cannot support Plaintiff's claim of a violation of his Fourth Amendment rights.

## II. Qualified Immunity

Even assuming, *arguendo*, that Plaintiff did have a reasonable expectation of privacy at 392 Adelphi Street, and that the Defendants' actions constituted a seizure, the Court finds that

the Defendants would be entitled to qualified immunity, and thus Plaintiff's claim would be barred.

"Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that '(1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct.'" *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "[A] court that decides this second question in a defendant's favor may award qualified immunity without conclusively answering the first." *Id.*

For the law to be clearly established, "the law must be so clearly established with respect to the 'particular conduct' and the 'specific context' at issue that 'every reasonable official would have understood' that his conduct was unlawful." *Id.* at 68–69 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "In short, if at least some reasonable officers in the defendant's position could have believed that the challenged conduct was within the bounds of appropriate police responses, the defendant officer is entitled to qualified immunity." *Id.* at 69 (internal quotation marks and citation omitted). "Even if an officer is mistaken . . . the officer will not be held liable if he acted reasonably and in good faith." *Washpon v. Parr*, 561 F. Supp. 2d 394, 403 (S.D.N.Y.

2008) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

Although consideration of a motion for summary judgment requires the Court to view the facts in the light most favorable to the nonmoving party, when a case "concerns the defense of qualified immunity . . . the Court considers only the facts that were knowable to the defendant officers." *White v. Pauly*, 580 U.S. 73, 76-77 (2017). In the instant case, the Court finds that Lieutenant Leuze, Officer Sosa, and Officer Duran had a reasonable basis to believe Plaintiff did not live at 392 Adelphi Street on April 19, 2020, and consequently, they are protected by qualified immunity.

Upon arriving at the scene, Officer Sosa spoke to Plaintiff, and heard Plaintiff explain that 392 Adelphi Street had passed to him based upon his father's death. (Def. 56.1 ¶ 29; Ex. E. at 16.) Plaintiff conceded to Officer Sosa that his Uncle Barry "might be" the registered owner of the property, however. (Def. 56.1 ¶ 33.) While Officer Sosa spoke to Plaintiff, two other police officers spoke to Uncle Barry, who explained that he owned the property "entirely," Plaintiff did not live at the property and could not stay, and that Plaintiff was homeless. (*Id.* ¶¶ 35-38.) Officer Rodriguez subsequently spoke to tenants who identified Uncle Barry as the landlord of 392 Adelphi Street, and

stated that Plaintiff did not live at the premises.  (*Id.* ¶¶ 44-45.)

Further discussions with Plaintiff revealed that "all" his belongings were in storage in Manhattan and that the set of keys Plaintiff had were provided by his Uncle Johnny.  (*Id.* ¶¶ 40, 46.) Inspecting the property, the officers observed that Plaintiff did not have a bed in the property, and the heat was not on.  (*Id.* ¶¶ 51-52.)  Plaintiff further explained to the officers that the last time he had been at the property was approximately two weeks ago, but that he did have a driver's license with the address 392 Adelphi Street.  (*Id.* ¶¶ 66, 68.)  The only facts known to the officers that would suggest Plaintiff had a right to be at the property were his own statements about inheriting the property from his father, his set of keys, and his driver's license with 392 Adelphi Street.

The Defendants did not find Plaintiff's arguments about his right to be present at the property convincing.  Lieutenant Leuze explained his thinking at the time of the incident giving rise to this action during his deposition for the instant case:

> [LIEUTENANT LEUZE:] Well, the uncle stated that he owned the property. The tenants that lived upstairs stated that they pay the uncle rent money to live there. The neighbors stated that the uncle owns the residence. The plaintiff stated that the uncle owned the residence.
>
> The plaintiff although -- also stated that his father just died. There was a -- that the father just died, that the uncle allowed him to stay there. At some point,

the plaintiff lived at the location, but it wasn't recently.

The plaintiff stated that he had an ID with the address on it. Which even though the address may be the same as the residence, it doesn't establish that he lives there at the current moment in time. It's that he could have lived there at some point. A lot of people do not update their DMV records.

. . . Further, there was -- there was an order of protection from the deceased father of the plaintiff against the son, the plaintiff in this case, that since expired before his death. I'm not sure of -- of the exact date. So that would establish the fact that he wasn't allowed in the residence for a period of time.

(Ex. D at 31-33.)   Similarly, Officer Sosa stated during his deposition that the fact that Plaintiff had to borrow keys from his Uncle Johnny "made [Officer Sosa] believe that [Plaintiff] didn't live there at all because he had to borrow the keys." (Ex. E at 37.)   Ultimately, Officer Sosa and Lieutenant Leuze concluded that Plaintiff had no right to remain at the property, and that it was appropriate to ask him to leave.

The second set of police officers, including Officers Duran and Carlin, engaged in similar discussions with Plaintiff when they arrived at the scene following his call.  (Def. 56.1 ¶¶ 90-106.)  Officer Carlin also heard from an additional family member on the phone, Lieutenant Tarik Sheppard of the NYPD, who explained that Plaintiff had not been living at 392 Adelphi Street on a regular basis.  (*Id.* ¶¶ 111-13.)  Officer Carlin then explained to Plaintiff that, even if he did inherit the property from his father, "until the will is completely done and through and you

take ownership, you don't own [392 Adelphi Street]." (*Id.* ¶ 131.) Based on their investigations, Officers Carlin and Duran reasonably concluded that Plaintiff did not live at 392 Adelphi Street, and that it was appropriate to ask him to leave the sidewalk near the home. (*Id.* ¶ 132.) The Court is aware of no law clearly establishing that Plaintiff had the right to remain in a property on which he had previously been trespassing, or in the immediate vicinity. *Wilson v. Sessoms-Newton*, No. 14-CV-106 (PKC), 2017 WL 3575240, at *10 (E.D.N.Y. Aug. 17, 2017) ("If anything, the Second Circuit has found that trespassers and squatters have no constitutionally protected property interests with respect to the places where they reside and thus have no Fourth Amendment protection as to those premises."); *see also Sanchez*, 635 F.2d at 64 ("[A] mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully . . . .")

The Supreme Court has stated that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). This Court finds that the police officers undertook a good faith investigation of the circumstances at 392 Adelphi Street on April 19, 2020, and that based on the facts they knew, made the reasonable determination that Plaintiff did not live at and was not permitted by his Uncle Barry to stay at the property and asked him to leave. The Court therefore concludes

that it was objectively reasonable for the Defendants to believe that asking Plaintiff to leave 392 Adelphi Street and the immediately surrounding area did not violate any clearly established law, and Defendants are entitled to qualified immunity on Plaintiff's federal claim of violations of his Fourth Amendment rights.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** and Plaintiff's claims are **dismissed** with prejudice. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and close this case.

The Court certifies that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

Dated:     July 29, 2024
           Brooklyn, New York

_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York